IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MIGUEL URIARTE-LOPEZ,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br>Case No. 2:08-CR-529 TS |

This matter is before the Court on Defendant Uriarte-Lopez's Motion to Suppress. Defendant seeks exclusion of all evidence obtained as a result of his arrest, including the search of his vehicle following the arrest. Defendant argues that the arrest and subsequent search of the vehicle were unlawful because the officers lacked probable cause to arrest Defendant. For the reasons discussed below, the Court finds that his arrest and the search of Defendant's car were supported by probable cause and will, therefore, deny the Motion.

I.  FINDINGS OF FACT

Detective Niesporek, with the Tooele City Police Department, was involved in two controlled purchases of narcotics and firearms in May 2008 from Defendant's co-Defendant Charles Chavez. The first controlled purchase took place on May 5, 2008. During that

1

transaction, Detective Niesporek purchased firearms from Mr. Chavez. Detective Niesporek agreed to meet with Mr. Chavez at a later date to purchase narcotics.

The second controlled purchase took place on May 9, 2008. On that date, Detective Niesporek met with Mr. Chavez to purchase methamphetamine. Detective Niesporek purchased approximately one ounce of methamphetamine from Mr. Chavez. During that transaction, Mr. Chavez had employed three different cars which Detective Niesporek believed were used to conduct counter-surveillance. Chavez and Niesporek agreed to a future transaction involving both narcotics and firearms.

Defendant was not involved in either the May 5 or May 9 transaction.

On May 27, 2008, Detective Niesporek and Mr. Chavez agreed to meet at the Flying J Truck Stop in Lake Point, Utah, to purchase additional narcotics and firearms. The officers who were to be involved in the May 27 transaction had determined that this was going to be a "buy bust"[1] and met previously to discuss how this would occur. At that briefing, the officers discussed the May 5 and May 9 transactions, including Mr. Chavez's use of counter-surveillance. As a result of this briefing, the officers involved in the May 27 transaction were aware that narcotics and firearms had been purchased in the past and that this transaction was also supposed involve the purchase of both narcotics and firearms.

The officers arrived at the Flying J Truck Stop at approximately 6:00 p.m. to set up. Detective Niesporek was in a green Pontiac Grand Prix, the undercover vehicle, in the Flying J parking lot. A take-down vehicle was parked next to the Pontiac. Additional surveillance vehicles were positioned throughout the parking lot.

---

[1] Tr. 14:4.

Once the officers were in place, Detective Niesporek was in contact separately with both Mr. Chavez and a confidential informant. The information provided by these individuals was then shared with the other officers involved in the operation.

The confidential informant had been involved in the May 5 transaction and was assisting in the May 27 transaction. Detective Niesporek had developed a relationship with the confidential informant and the confidential informant had previously given information which was corroborated and found to be trustworthy.

At some point, Mr. Chavez contacted Detective Niesporek and informed him that he, Mr. Chavez, had met with his people and that they were on their way to the meeting point. Later, Detective Niesporek was contacted by the confidential informant who advised him that the individuals with the narcotics were on their way and that he/she was following those individuals to the location of the transaction. The confidential informant advised Detective Niesporek that those individuals with the narcotics, including Chavez, were in a white compact car. This information was provided to the other officers involved in the transaction.

Detective Niesporek later received a phone call from these individuals stating that they were exiting the freeway and to watch for a white compact car. This information was provided to the officers involved with the transaction. Detective Niesporek did not see the white compact car pull into the parking lot, but saw Mr. Chavez and Gilberto Salazar walk up to the Pontiac where Detective Niesporek was waiting and enter the vehicle.

Agent Tripp, with Utah Adult Probation and Parole, was involved in the May 27 operation. Agent Tripp had received the information, discussed above, wherein it was indicated that the individuals with the narcotics were on their way to the Flying J Truck Stop in a white compact car. Agent Tripp observed a white compact car—a Mitsubishi Galant—pull into the

3

Flying J parking lot. Agent Tripp watched as the Mitsubishi drove around the parking lot and parked in the south end of the lot. She observed two individuals get out of the Mitsubishi and walk in the direction of the undercover vehicle. A third individual, the Defendant, remained in the Mitsubishi.

Agent Eckman, with the Utah Department of Corrections, was also involved in the May 27 operation with Agent Tripp. Agent Eckman, like Agent Tripp, had been informed that the individuals with the narcotics would be in a white compact car. Agent Eckman observed a white Mitsubishi enter the parking lot. Agent Eckman testified that the white Mitsubishi was the only car to enter the parking lot in that general time frame which matched the description given about the white vehicle. Agent Eckman observed two individuals get out of the Mitsubishi and walk toward the undercover vehicle. The driver of the Mitsubishi remained in the car.

As indicated, when the two individuals exited the white Mitsubishi, they walked toward the Pontiac in which Detective Niesporek was located. Detective Niesporek did not see these individuals exit the white Mitsubishi, but did observe Mr. Chavez and Mr. Salazar enter his vehicle. Mr. Chavez sat in the front seat, while Mr. Salazar sat in the back. Mr. Salazar handed Detective Niesporek a snack-sized chip bag. When Detective Niesporek opened the bag, he observed the requested narcotics. Detective Niesporek was informed that they, Chavez and Salazar, were unable to obtain a firearm.

At that point, Detective Niesporek informed another undercover officer—Detective Hansen—to call a third officer—Trooper Prescott—to bring out the money. This was the pre-arranged take-down signal. Trooper Prescott had been stationed inside the Flying J Truck Stop. When Trooper Prescott came out of the store, the take-down order was given. By being issued,

4

the take-down order indicated to the officers involved that either narcotics or firearms had been purchased.

When the take-down order was given, Agent Eckman took the assignment of going to the white Mitsubishi to secure the area. Agent Eckman had his weapon drawn, identified himself as a police officer, and ordered the driver of the Mitsubishi to display his hands. The driver—identified as the Defendant—failed to comply with these commands. Defendant would not show his hands and moved them toward the dash. Trooper Prescott and another officer came to assist Agent Eckman. When Defendant continued to refuse to comply with these commands, he was pulled from the vehicle and arrested.

Once all of the individuals were taken into custody, the vehicles were searched. Trooper Prescott assisted in the search of the white Mitsubishi. During the search, Trooper Prescott noticed that the center console had been taken apart and was not secured properly. Trooper Prescott moved the center console and discovered several baggies with a white powdery substance as well as a firearm.

## II.  DISCUSSION

Defendant challenges both his arrest and the ensuing search of the white Mitsubishi. Defendant argues that the officers lacked probable cause to arrest him or to search the vehicle. The Court finds that both the arrest and the search were supported by probable cause. Because of this finding, the Court need not address the other arguments made by the government in support of the arrest and search.

A.   THE ARREST

Defendant first argues that the officers lacked probable cause to arrest him. "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and

of which they ave reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[2] "Probable cause is measured against an objective standard of reasonableness and may rest on the collective knowledge of all officers involved in an investigation rather than solely on the knowledge of the officer who made the arrest."[3]

      A brief recitation of what information was known to the officers at the time of Defendant's arrest is helpful in determining whether or not probable cause existed. Detective Niesporek had been involved in two prior transactions with Defendant's co-Defendant Charles Chavez. On May 5, 2008, Detective Niesporek purchased firearms from Chavez and on May 9, 2008, Detective Niesporek purchased narcotics from Chavez. At the May 9 transaction, the parties agreed to meet to purchase additional firearms and narcotics.

      In relation to the May 5 transaction, Detective Niesporek had worked with a confidential informant. Detective Niesporek had worked with the confidential informant in the past and was able to verify the veracity of the information given by the confidential informant. Detective Niesporek worked with the confidential informant again in relation to the May 27 transaction.

      On May 27, 2008, Detective Niesporek was contacted by Mr. Chavez who informed Detective Niesporek that he and others were on their way. The confidential informant advised Detective Niesporek that those individuals with the narcotics, including Chavez, were in a white compact car. This information was provided to the other officers involved in the transaction. Detective Niesporek was later informed that the individuals with the narcotics were exiting the

---

[2] *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (internal quotation marks omitted).

[3] *United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1209 (10th Cir. 2007).

freeway and was told to watch for a white compact car.  Again, the other officers were made aware of this fact.

Agents Tripp and Eckman observed a white Mitsubishi matching the description given by the confidential informant enter the Flying J Truck Stop parking lot.  Two men exited the vehicle and walked toward the undercover vehicle where Detective Niesporek was situated.  The driver remained in the vehicle.  Though he had not seen the white vehicle, Detective Niesporek observed Mr. Chavez and Mr. Salazar entered the undercover vehicle.  Detective Niesporek was handed a snack-sized chip bag which contained narcotics.

At this point, another officer was directed to call Trooper Prescott, who was stationed inside the store, to bring out the money.  This was the pre-arranged take-down signal, indicating that either narcotics or firearms had been purchased.  Once Trooper Prescott exited the store, the officers involved began to secure those individuals involved in the transaction, including Defendant who remained in the white Mitsubishi.

Based on the above, the Court finds that the officers had probable cause to believe that Defendant was involved in the distribution of narcotics.  Defendant was the driver a vehicle which matched the description given by a confidential informant as containing narcotics.  That vehicle entered the parking lot in the same time frame that was provided to Detective Niesporek and relayed to the other officers.  Additionally, the passengers of the vehicle exited and approached the undercover vehicle.  Soon after, the bust signal was given, indicating that narcotics or firearms had been purchased.  Based on the totality of the circumstances, the Court finds that a reasonable person would believe that an offense had been committed by Defendant.

Defendant points to *United States v. Di Re*,[4] in support of his argument that the officers lacked probable cause. In *Di Re*, an investigator was informed by Reed that he was to buy counterfeit gasoline ration coupons from Buttitta. The investigator came upon Buttitta's car and found Buttitta in the driver's seat, Reed in the back, and the defendant Di Re in the passenger seat. The officers arrested all three and, pursuant to a search, discovered additional counterfeit gasoline ration coupons on Di Re's person. The Court held that the police lacked probable cause to arrest Di Re where Reed had identified Buttitta in a criminal enterprise, but not Di Re.[5]

*Di Re* is distinguishable. This situation before the Court is not, as it was in *Di Re*, that the confidential informant had identified some individuals to the exclusion of others. Rather, the confidential informant had provided information that those individuals in the white compact car, which included Defendant as the driver of that vehicle, were in possession of the narcotics. Thus, Defendant was implicated in criminal activity, unlike the defendant in *Di Re*.

The Court agrees that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause . . . ."[6] "Nor is nearness to the place of the arrest of a co-conspirator or to the place of illegal activity sufficient to establish probable cause."[7] However, there are facts here, in addition to Defendant's association with others engaged in criminal activity, which support a finding of probable cause. Therefore, the Court finds that Defendant's arrest was supported by probable cause.

---

[4]332 U.S. 581 (1948).

[5]*Id.* at 594.

[6]*Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

[7]*United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998) (citing *Di Re*, 332 U.S. at 593).

B.     THE SEARCH

Defendant also seeks to suppress the evidence resulting from the search of his vehicle. The Court finds that the search was permissible under the automobile exception to the warrant.

The "automobile exception" to the warrant requirement permits an "officer possessing probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant."[8]  The same evidence that supports the Court's finding that probable cause existed to arrest Defendant, supports a probable cause finding justifying the search of the vehicle. As set forth above, the officers here had probable cause to believe that Defendant was involved in the distribution of narcotics and/or firearms.  Based on the same facts that provided the officers probable cause to arrest Defendant, the officer had probable cause to believe that the white Mitsubishi contained contraband related to that distribution activity.

### III.  CONCLUSION

Based upon the foregoing, it is therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 16) is DENIED.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the new trial date of February 2, 2009, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

---

[8] *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007).

DATED   December 15, 2008.

                                BY THE COURT:

                                _____
                                TED STEWART
                                United States District Judge